**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**ANDREA B.,**

**Plaintiff,**

**v.**

**Civil Action 3:22-cv-055**
**Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

**OPINION AND ORDER**

Plaintiff, Andrea B., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 13, 14). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 9) and **AFFIRMS** the Commissioner's decision.

## I. BACKGROUND

Plaintiff filed her applications for DIB and SSI on March 7, 2019, alleging disability beginning July 1, 2017, due to anxiety, depression, Post-Traumatic Stress Disorder ("PTSD"), and acid reflux. (Tr. 175–88, 239). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on September 28, 2020. (Tr. 39–66). The ALJ denied benefits in a written decision on December 14, 2020. (Tr. 12–38). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on February 23, 2022 (Doc. 1), and the Commissioner filed the administrative record on April 25, 2022 (Doc. 8). The matter has been briefed and is ripe for consideration. (Docs. 9, 11, 12).

**A. Relevant Hearing Testimony**

The ALJ summarized the reports presented to the administration and testimony from Plaintiff's hearing:

> While a history of special education was noted in the record, she testified that she was generally able to read and write, though she struggled with some words (Exhibit 1F).
>
> ***
>
> [Plaintiff] testified that she had spurts of wanting to yell or scream at people, and she suggested she went off on coworkers and supervisors in the past. She stated she isolated herself and sat around the house with the curtains drawn. However, in a November 2017 self-assessment, [Plaintiff] reported that she was able to interact with the general public (Exhibit 16E/2).
>
> She testified that she was able to go grocery shopping quickly once to twice per week, and she goes to church about once per month. She stated she visits her family. She noted that she rode the bus alone when she needed to, which is currently about once per week.

(Tr. 20–21).

> In November 2017, several months after the alleged onset date, [Plaintiff] completed a self-assessment for the Montgomery County Department of Job and Family Services (Exhibit 16E). She acknowledged that she was able to sit and stand/walk for over six hours per day and lift over fifty pounds (Exhibit 16E/2). She stated she was able to remember work locations and procedures, carry out instructions, maintain attention and concentration, perform activities within a schedule, sustain an ordinary routine, and interact with the general public (Exhibit 16E/2). At the hearing, [Plaintiff] testified that she was unable to work because of daily issues with anxiety. She stated she could not work longer because she has spurts of wanting to yell and scream at people or wanting to run out the door, and she stated she found herself going off on coworkers and supervisors in the past. However, she indicated that she had not been terminated in about five to ten years, and she instead chose to quit her jobs. She noted she also had some trouble outside of work, stating that she has gotten into it with others in stores if they look at her funny. She indicated that her typical day was not very good, as she always had

> anxiety. She stated she got up and did the best she could, and her bad days occurred about three to four times per week. She noted that she had panic attacks two to three times per month with her most recent one being about two weeks before the hearing. She noted some emergency room visits for chest pain because she thinks she is having a heart attack. She had flashbacks of her son about three times per week, and she had nightmares at times. Even on bad days, she was able to get dressed and clean up some. She stated she isolated herself and sat around the house with the curtains drawn. She was able to go grocery shopping quickly once to twice per week, and she goes to church about once per month. She stated she visits her family, but it was rough due to her anxiety. She noted that she rode the bus when she needed to, which is currently about once per week, and she rode it alone, though it caused anxiety and left her feeling closed in. On her better days, she was able to do laundry and leave her curtains open. [Plaintiff] noted that she sees her psychiatrist about every three months, and she has a case manager and employment specialist that she saw about weekly before the pandemic. She noted that her medications helped a bit but not completely. She indicated that she generally had no problems reading and writing, though there were some words with which she struggled.

(Tr. 23).

**B. Relevant Medical Evidence:**

The ALJ summarized the medical records as to Plaintiff's mental health symptoms:

> The record demonstrates a longstanding history of mental impairments, but the record does not support symptoms as intense, persistent, or limiting as alleged. Remote education records reflect that [Plaintiff] participated in special education (Exhibit 1F)…[Plaintiff] has been receiving mental health treatment since at least 2014 (Exhibit 13F). Records dating to 2014 show a history of anxiety with panic attacks (e.g. Exhibit 7F/84). 2015 records reflect a history of depression (Exhibit 7F/66). PTSD was noted by 2016 (e.g. Exhibit 7F/55). Prior to the alleged onset date, she reported to the emergency room on a number of occasions with symptoms that could be related to anxiety, including fatigue, dizziness, a fluttering in her chest, nausea, some occasional dyspnea on exertion, chest pain, and dry mouth (e.g. Exhibits 6F, 7F, 14F, 19F, and 20F). Examinations were generally benign, including with respect to her mental status (e.g. Exhibits 6F, 7F, 14F, 19F, and 20F). She sometimes had some abnormalities in her ECGs, though her echocardiograms were generally within normal limits (e.g. Exhibits 6F, 7F, 14F, 19F, and 20F). Chest x-rays and other imaging studies during that time were often unremarkable (e.g. Exhibits 6F, 7F, 14F, 19F, and 20F). While her anxiety may have contributed to symptoms, she was mostly diagnosed with upper respiratory infections or generalized abdominal pain with nausea and vomiting (e.g. Exhibits 6F, 7F, 14F, 19F, and 20F). [Plaintiff] continued to report to the emergency room for a variety of complaints after the alleged onset date, including with physical symptoms that could be related to her mental impairments (e.g. Exhibits 6F, 7F, 14F, 19F, 20F, and 21F). However, her emergency room visits have not resulted in

any significant medically determinable impairments, and her examinations and objective studies were generally unremarkable (e.g. Exhibits 6F, 7F, 14F, 19F, 20F, and 21F). During those emergency room visits, her affect, judgment, and mood were often normal when her mental status was discussed (e.g. Exhibits 6F, 7F, 14F, 19F, 20F, and 21F). Furthermore, her actual mental health treatment notes, which are more thoroughly discussed below, reflect relatively good mental functioning that does not support anxiety symptoms severe enough to warrant her emergency room visits (Exhibits 1F-23F). ***

May 2017 psychiatry notes, which were the most recent mental health treatment notes before her alleged onset date, show that [Plaintiff] was doing better (Exhibit 13F/74). She noted she was very busy with work (Exhibit 13F/74). In October 2017, [Plaintiff] reported to the emergency room after she ran out of her anxiety medications (Exhibit 7F/42). November 2017 treatment notes, which are the first mental health treatment notes after the alleged onset date, show that [Plaintiff] had completed training for a new job (Exhibit 13F/76). Her mental status was generally unremarkable, and she denied suicidal or homicidal ideation (Exhibit 13F/76). Her psychiatric nursing notes from that month reflect that [Plaintiff] was only mildly anxious, and she was neatly groomed with good eye contact (Exhibit 13F/78). Thinking was well organized and goal oriented (Exhibit 13F/78). Her psychiatrist's notes reflect a relatively normal mental status despite her anxiety (Exhibit 13F/79). Speech was normal and psychomotor activity was average (Exhibit 13F/79). Thought processes were logical, thought content was normal, and she had no hallucinations or other abnormalities in perception (Exhibit 13F/79). Eye contact was good, and she was cooperative (Exhibit 13F/79). Cognition was normal, attention was focused, insight and judgment were good, and intelligence was estimated to be average (Exhibit 13F/79). The next month, [Plaintiff] reported she was doing a little better and was not as depressed since starting a new medication (Exhibit 13F/84). She reported that her anxiety also initially decreased, but it increased after starting a new job (Exhibit 13F/84). She denied any anger, suicidal ideation, or homicidal ideation (Exhibit 13F/84). She reported that she was sleeping well at night and denied any mania or paranoia (Exhibit 13F/84). Her mental status continued to be relatively normal (Exhibit 13F/84). Nonetheless, she requested her medication be increased (Exhibit 13F/90).

However, later in December 2017, [Plaintiff] reported to the emergency room with nausea and shaking after starting to increase her medication (Exhibit 7F/42). Shortly thereafter, [Plaintiff] was admitted overnight with possible serotonin syndrome versus anti-cholinergic toxicity versus a combination of the two issues, suspected personality disorder, complicated bereavement, and an unspecified depressive disorder, adjustment disorder versus complicated bereavement (Exhibit 7F/23, 29). There was also a note to rule out a somatic symptom disorder (Exhibit 7F/29). Nevertheless, she did not meet the criteria for inpatient psychiatric admission, and medications were discontinued (Exhibit 7F/30). ***

About a month later, [Plaintiff] was brought to the emergency room with complaints of an anxiety attack, and she just wanted something to calm her down (Exhibit 7F/23). She stated her symptoms started as an anxious feeling with chest pain and shortness of breath (Exhibit 19F/253). By the time she got to the emergency room, her symptoms were already remitting, and she was no longer anxious by the time she was seen by a physician (Exhibit 19F/253). Her examination was completely benign (Exhibit 19F/256). She was given medication but told she needed to see a regular provider for those complaints, and she was instructed to keep taking her other medications and to quit smoking (Exhibit 19F/256). [Plaintiff] returned to the emergency room in February 2018 with complaints of anxiety, stating she had been out of medications for four to five weeks (Exhibit 7F/22). She denied suicidal or homicidal ideation (Exhibit 7F/22). That month, [Plaintiff] underwent a diagnostic assessment with a new mental healthcare provider (Exhibit 8F/3). She reported that her anxiety caused absenteeism, and she stated she was unable to keep jobs long (Exhibit 8F/4). She noted anger and frustration with past work, and she sometimes walked out (Exhibit 8F/3). She endorsed nightmares two times per week with some flashbacks to her trauma, and she had recurring, invasive, and uncontrollable thoughts of the events (Exhibit 8F/6). She noted an increased startle reflex but denied hypervigilance (Exhibit 8F/6). She stated she had difficulty feeling positive emotions, and she avoided some individuals due to her trauma (Exhibit 8F/6). Depressive symptoms included decreased motivation, anhedonia, fatigue, decreased appetite, decreased sleep, feelings of worthlessness, and a history of suicidal ideation without attempts (Exhibit 8F/7). Her depressive symptoms lasted about two to three weeks at a time (Exhibit 8F/7). She had bereavement and guilt related to her son's death (Exhibit 8F/7). She indicated her anxiety was her biggest problem with difficulty controlling worry, irritability, racing thoughts, and feeling tense (Exhibit 8F/7). She stated she had panic attacks about once per week with sweaty hands, nausea, increased heart rate, feeling like she cannot breathe, and headaches (Exhibit 8F/7). She noted anger and aggression, stating that she did not like criticism and had a history of physical aggression (Exhibit 8F/7). Impulsivity symptoms included having a short attention span, and she interrupted others (Exhibit 8F/7). Mood swings occurred daily and alternate between anger and sadness, and she also indicated that she had manic symptoms such as elated mood, decreased sleep, increased racing thoughts, hyperactivity, hyper talkativeness, and increased goal-oriented activity (Exhibit 8F/7). She was diagnosed with severe recurrent major depressive disorder without psychotic features, PTSD, a panic disorder without agoraphobia, and uncomplicated bereavement (Exhibit 8F/10). In March 2018, the clamant reported to the emergency room with complaints of anxiety related to finding mold in her room, and she was started on a new medication (Exhibit 7F/22). She returned to the emergency room the next day with complaints of nausea, vomiting, and abdominal pain after starting her new medication (Exhibit 7F/22). She told one emergency room provider that she had been out of her Cymbalta for two months (Exhibit 19F/281). Nevertheless, March 2018 psychiatry notes reflect a relatively normal mental status despite her depression and anxiety (Exhibit 8F/12). Speech was average, grooming was average, and hygiene was good (Exhibit 8F/12). Thought

processes were goal-directed and thought content was normal with no suicidal or homicidal ideation, no delusions, no hallucinations, and no other abnormalities in perception (Exhibit 8F/12). She was cooperative with average eye contact (Exhibit 8F/12). She had no impairment in cognition, and intelligence was average (Exhibit 8F/12). At that time, she had been without medications for three months (Exhibit 8F/13). Her relatively good mental status even despite noncompliance with medication is not consistent with symptoms as intense, persistent, or limiting as alleged.

May 2018 treatment notes reflect a similar mental status (Exhibit 8F/14-15). In addition to the findings at her prior visit, associations and judgment were intact, and she was insightful of her condition (Exhibit 8F/14). Recent memory and attention span were average (Exhibit 8F/15). June 2018 treatment notes reflect that she was handling part-time work "fairly well" (Exhibit 8F/18). She noted feeling stressed and overwhelmed at times, but she was able to use her coping skills (Exhibit 8F/18). She continued to present with a relatively normal mental status examination, and her mood was euthymic (Exhibit 8F/19). Her provider noted that her grief issues were stable while her depression and panic had improved (Exhibit 8F/19). Her mental status was relatively unchanged through June 2020 (Exhibits 8F, 9F, and 18F). While findings related to her mood varied, she continued to otherwise demonstrate relatively normal mental functioning (Exhibits 8F, 9F, and 18F). In November 2018, [Plaintiff] reported to the emergency room with complaints of palpitations and dull chest pain with a recent upper respiratory infection, and she also complained of a headache, nausea, and lightheadedness (Exhibit 7F/9). She was held overnight for testing (Exhibit 7F/9). A stress test showed poor exercise tolerance with mild worsening of baseline chest pain and nonischemic T wave changes with exercise, and the chest pain improved during recovery (Exhibit 7F/137). Her echocardiogram showed no evidence of myocardial ischemia or scar, and she had a normal ejection fraction above 70% (Exhibit 7F/136). One of her diagnoses was anxiety (Exhibit 7F/16). In December 2018, [Plaintiff] reported to the emergency room with complaints of a panic attack with nausea and sweating (Exhibit 7F/9). Upon arrival, she had no symptoms but complained of weakness (Exhibit 7F/9). In March 2019, [Plaintiff] told her psychiatrist that she stopped her Wellbutrin after only trying it for approximately two weeks, as it caused heart palpitations and made her feel "weird" and nauseated (Exhibit 8F/34). Nevertheless, her mental status continued to be relatively normal despite her anxiety (Exhibit 8F/35). She presented with average speech and grooming with good hygiene (Exhibit 8F/35). Thought processes were goal directed, associations were intact, and she had no hallucinations, delusions, obsessions, suicidal or homicidal ideation, or other abnormal or psychotic thoughts (Exhibit 8F/3). She was insightful of her condition, and recent memory, remote memory, and attention span and concentration were all average (Exhibit 8F/35). In April 2019, [Plaintiff] stopped taking her prescribed medications again because of side effects, and she restarted a leftover medication from a prior adjustment that she had previously stated was not effective (Exhibit 8F/39). This time, she reported that it was working fine, and things were improving (Exhibit 8F/39). Her mental status

continued to be similar to prior findings and suggested adequate mental functioning (Exhibit 8F/39-40). Accordingly, the record does not support symptoms or limitations as severe as alleged even when she was not adhering to her treatment plan.

July 2019 treatment notes show [Plaintiff] was working four-hour shifts with a cleaning company in the evening, and she rode the bus (Exhibit 9F/6). Her mood was stable, and her anxiety level was fairly well controlled (Exhibit 9F/6). She denied depressive symptoms and suicidal or homicidal ideation (Exhibit 9F/6). Her appetite was good, and her sleep was restful (Exhibit 9F/6). Her provider discussed tapering of Klonopin (Exhibit 9F/6). Her mental status was generally unremarkable. After an August 2019 emergency room visit for chest and abdominal pain, [Plaintiff] was advised to discuss additional resources for optimization of her underlying anxiety with her mental healthcare providers (Exhibit 11F/19). September 2019 treatment notes showed that [Plaintiff]'s mental health symptoms were improved, and she did not exhibit any depression or anxiety (Exhibit 18F/44). In October 2019, [Plaintiff] reported to the emergency room with complaints of chest pain that felt like it was pressure, palpitations, nausea, and shortness of breath, and she noted it felt similar to her anxiety (Exhibit 21F/32). She reported that she felt better after taking her Klonopin (Exhibit 21F/32). She acknowledged that her complaints of shortness of breath and nausea only lasted a few minutes and resolved without treatment (Exhibit 21F/35). In November 2019, [Plaintiff] reported to the emergency room in part because she was out of Klonopin, which she reported spilling in the bathroom sink (Exhibit 21F/119). She was given a bridge prescription until she could get her refill, but she returned a few days later because her insurance would not fill the prescription early (Exhibit 21F/123, 132). She was requesting a different prescription because she was concerned she was going to have a panic attack without her medication, though she acknowledged that her psychiatrist was planning to wean her off it (Exhibit 21F/137). In May 2020, [Plaintiff]'s psychiatrist completed a form identifying varying symptoms that included mood disturbances, emotional lability, recurrent panic attacks, feelings of guilt or worthlessness, and anhedonia or pervasive loss of interest (Exhibit 17F). However, her mental status from a telehealth visit demonstrated adequate mental functioning despite her anxiety and depression (Exhibit 17F/64-66). [Plaintiff]'s June 2020 mental status examination, which is the last in the record, continued to be relatively normal despite her anxiety and mildly depressed mood (Exhibit 18F/54-56). She had goal-directed though processes and intact associations with no hallucinations, delusions, obsessions, suicidal or homicidal ideation, or other abnormal or psychotic thoughts (Exhibit 18F/55-56). Judgement was intact, attention span and concentration were average, and recent and remote memory were average (Exhibit 18F/55). ***

*** In November 2017, *** she reported that she completed training for a new job (Exhibit 13F/76). She noted that she got positive reviews from residents (Exhibit 13F/88). [Plaintiff] reported that she was working full-time in February 2018 (Exhibit 8F/4). May 2018 treatment notes indicate that [Plaintiff] was thinking of

> volunteering to help limit her free time (Exhibit 8F/14). November 2018 records reflect that [Plaintiff] was able to live alone (Exhibit 7F/15). In January 2019, [Plaintiff] was spending time with friends dancing (Exhibit 20F/316). In April 2019, [Plaintiff] went to a job interview (Exhibit 8F/39). July 2019 treatment notes show that [Plaintiff] was working as a custodian in buildings without ventilation or air conditioning, and she was taking the bus (Exhibit 20F/423). September 2019 treatment notes show that [Plaintiff] has been in a relationship for about a year (Exhibit 20F/498). She was planning a marriage, and she reconnected with a younger sibling (Exhibit 18F/44). March 2020 treatment notes reflect that [Plaintiff] was still engaging in some work activity (Exhibit 18F/72). ***

(Tr. 23–28).

**C. The ALJ's Decision**

The ALJ found that Plaintiff meets the insured status requirements through September 30, 2024 and has not engaged in substantial gainful activity since July 1, 2017, her alleged onset date of disability. (Tr. 17). The ALJ determined that Plaintiff suffered from the severe impairments of a depressive disorder, an anxiety disorder, posttraumatic stress disorder (PTSD), a panic disorder, borderline intellectual functioning, and nicotine abuse. (Tr. 18). Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meets or medically equal a listed impairment. (Tr. 20).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ found:

> After careful consideration of the entire record [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [Plaintiff] is limited to unskilled, simple, routine, repetitive tasks. She is unable to perform at a production-rate pace, such as assembly line work, but she is able to perform goal-oriented work such as an office cleaner. [Plaintiff] is limited to occasional contact with coworkers and supervisors but with no teamwork, tandem tasks, or over-the-shoulder supervision. [Plaintiff] is limited to occasional contact with the general public as part of job duties. [Plaintiff] is further limited to occasional changes in an otherwise routine work setting.

(Tr. 22).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements

concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record …" (Tr. 23).

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff is capable of performing her past relevant work as a nursing home housekeeper or hospital housekeeper. (Tr. 30–31). The vocational expert also identified medium, unskilled occupations that exist in significant numbers in the national economy that Plaintiff could perform. (*Id.*). She therefore concluded that Plaintiff has not been disabled within the meaning of the Social Security Act since July 1, 2017. (Tr. 32).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

In her Statement of Errors, Plaintiff contends that the ALJ improperly evaluated the medical source opinions of treating psychiatrist, Jeannine Sheppard, D.O. (Doc. 9 at 5). Particularly, Plaintiff argues that the ALJ erred by not including off-task and absenteeism limitations as indicated by Dr. Sheppard. Plaintiff also says that the superficial interaction limitations, as found by the state agency psychologists, Todd Finnerty, Psy.D., and Juliette Savitscus, Ph.D., should have been included in the RFC determination. (*Id.* at 7; Doc. 12 at 2). The Commissioner counters that the ALJ properly considered the opinion evidence and prior administrative medical findings as well as the other record evidence, and assessed functional limitations to the extent she found were supported by the evidence. (*See generally* Doc. 11).

### A. ALJ's Finding as to Dr. Sheppard's Opinion

The ALJ found the opinion of treating psychiatrist, Jeannine Sheppard, D.O. "somewhat persuasive," noting in relevant part:

> The opinion of Dr. Sheppard, [Plaintiff]'s psychiatrist, is somewhat persuasive (Exhibit 17F). Dr. Sheppard opined [Plaintiff] generally had no to moderate limitations in factors related to a mental residual functional capacity with marked limitations in the ability to sequence multistep activities and managing her symptoms (Exhibit 17F). They concluded [Plaintiff] had moderate limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting, or maintaining pace with a moderate to marked limitation in adapting or managing oneself (Exhibit 17F). Despite generally finding no more than moderate limitations, Dr. Sheppard concluded [Plaintiff] would be off-task 15% of the time and would be absent three times per month (Exhibit 17F). In addition to the time off-task and absenteeism being inconsistent with the record, Dr. Sheppard's opinion is not well explained, as they only noted a few varying symptoms and stated that depressive episodes can last more than two weeks (Exhibit 17F). Additionally, the few marked limitations, along with their absenteeism and time off-task findings, are generally not supported by or consistent with the record, which usually reflected relatively good mental functioning despite [Plaintiff]'s reported symptoms (Exhibits 1F-23F). For example, she usually presented with average speech and grooming with good hygiene (e.g. Exhibit 8F/35). Thought processes were goal-directed, associations were intact, and she had no hallucinations, delusions, obsessions, suicidal or homicidal ideation, or other

> abnormal or psychotic thoughts (e.g. Exhibit 8F/3). She was insightful of her condition, and recent memory, remote memory, and attention span and concentration were all average (e.g. Exhibit 8F/35). Those findings suggest somewhat better functioning than opined by Dr. Sheppard. As such, Dr. Sheppard's opinion is only somewhat persuasive.

(Tr. 29–30).

Plaintiff argues that the ALJ erred in evaluating the mental health medical source opinions. (Doc. 9 at 1). Specifically, she claims that the ALJ erred by finding Dr. Sheppard's opinion only somewhat persuasive and by not adopting the doctor's opinion that Plaintiff would be off task for fifteen percent of the workday and absent from work three times a month. (*Id.* at 5). The ALJ found that conclusion to be "generally not supported by or consistent with the record." (Tr. 29–30). In response, Plaintiff states that the ALJ failed to address the frequency of Plaintiff's hospital visits over the course of her disability claim. (Doc. 9 at 5). Plaintiff also claims that the ALJ picked out portions of the record that supported her position rather than relying on Dr. Sheppard's full professional psychiatric assessment. (*Id.* at 6).

To begin, an ALJ is not required to adopt a medical opinion in full. *Ferguson v. Comm'r of Soc. Sec.*, No. 2:18-CV-1024, 2019 WL 2414684, at *5 (S.D. Ohio 2019), report and recommendation adopted sub nom. *Ferguson v. Comm'r of Soc. Sec.*, No. 2:18-CV-1024, 2019 WL 3083112 (S.D. Ohio 2019). Thus, the ALJ did not have to adopt Dr. Sheppard's opinion that Plaintiff would be off task for part of the workday and miss a few times a month. The ALJ not only stated her disagreement, but she also explained why she did not find that part of the opinion persuasive. The ALJ explained that the opinion did not sufficiently explain how the evidence amounts to Plaintiff missing work. (Tr. 29–30). Dr. Sheppard pointed to a few varying symptoms and stated that Plaintiff's depressive episodes could last more than two weeks. (*Id.*). Upon review of the record, however, the ALJ determined that Dr. Sheppard's opinion that Plaintiff's symptoms

would cause her to miss significant amounts of work was generally unsupported. (*Id.* (finding that evidence from the record, Tr. 1074, reflected the Plaintiff to have good mental functioning despite the symptoms)).

Further, Plaintiff's assertion that the ALJ failed to address the frequency of the hospital visits over the course of her disability claim is misguided. The ALJ discussed Plaintiff's emergency visits several times throughout the decision. (Tr. 23–28). And the ALJ did more. She noted that Plaintiff, at medical appointments and evaluations, presented with average speech and grooming and with good hygiene. (*Id.*) Plus, Plaintiff's thought processes were goal-directed, and associations were intact. (*Id.*). She had no hallucinations, delusions, obsessions, suicidal or homicidal ideation, or other abnormal or psychotic thoughts. (*Id.*). The ALJ also included that Plaintiff was insightful about her condition, and that her recent memory, remote memory, attention span, and concentration were all average. (*Id.*).

That analysis was enough. The ALJ is not required to give extra evidentiary or controlling weight to any medical opinion. *Natalie S. v. Comm'r of Soc. Sec.*, No. 2:21-CV-1631, 2022 WL 3593098, at *8 (S.D. Ohio 2022). The only thing required is that the ALJ "build an accurate and logical bridge between the evidence and his conclusion." (*Id.* at *7). The ALJ did so throughout the entire opinion. On several occasions, the ALJ relied upon specific findings from the medical reports that contradicted some of Dr. Sheppard's findings. The ALJ reached at least a minimum level of articulation that demonstrates the evidence she used to make her determination was consistent with the facts presented. *Stacie B. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4650, 2022 WL 1793149, at *6 (S.D. Ohio 2022), report and recommendation adopted, No. 2:21-CV-4650, 2022 WL 2237057 (S.D. Ohio 2022) ("[a] minimum level of articulation is needed to provide sufficient rationale for a reviewing court.") (quoting *Warren I. v. Comm'r of Soc. Sec.*, No. 20-

495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 2021). As such, the ALJ established by sufficient evidence that Plaintiff's limitations were not as extensive as Dr. Sheppard suggested.

At base, the ALJ thoroughly considered Dr. Sheppard's opinion in relation to the medical evidence and reasonably found that some of her findings were inconsistent with that medical evidence while other parts of it were persuasive. Thus, Plaintiff has not shown that the ALJ committed an error when she did not adopt all of Dr. Sheppard's opined limitations.

**B. ALJ's Finding as to Doctors Finnerty and Savitscus's Opinion**

When discussing the state agency opinions, the ALJ determined:

> The opinions of Drs. Todd Finnerty and Juliette Savitscus, non-examining psychologists with the DDD, are somewhat persuasive (Exhibits 3A, 4A, 7A, and 8A). Drs. Finnerty and Savitscus opined [Plaintiff] had a mild limitation in interacting with others with moderate limitations in the remaining "paragraph B" criteria (Exhibits 3A, 4A, 7A, and 8A). Drs. Finnerty and Savitscus opined [Plaintiff] was able to complete simple, routine tasks without a fast production pace, and she retained the ability to adjust to infrequent changes (Exhibits 3A, 4A, 7A, and 8A). Dr. Savitscus clarified that [Plaintiff] was limited to one- to three-step tasks (Exhibits 7A and 8A). The opinions of Drs. Finnerty and Savitscus are somewhat supported by the record, which often demonstrated relatively good mental functioning despite her psychological complaints and mood abnormalities (Exhibits 1F-23F). For example, she usually presented with average speech and grooming with good hygiene (e.g. Exhibit 8F/35). Thought processes were goal-directed, associations were intact, and she had no hallucinations, delusions, obsessions, suicidal or homicidal ideation, or other abnormal or psychotic thoughts (e.g. Exhibit 8F/3). She was insightful of her condition, and recent memory, remote memory, and attention span and concentration were all average (e.g. Exhibit 8F/35). Those findings indicate an ability to perform work activity within the limitations opined by Drs. Finnerty and Savitscus. However, despite indicating that [Plaintiff] only had mild limitations with respect to interacting with others, Drs. Finnerty and Savitscus opined [Plaintiff] was limited to superficial interaction with supervisors while Dr. Savitscus opined the superficial limitation also applied to coworkers and the public (Exhibits 3A, 4A, 7A, and 8A). The need for any limitation in interacting with others warrants finding a moderate limitation in the relevant "paragraph B" criteria, and the undersigned adjusted the "paragraph B" criteria accordingly. The undersigned also notes that Drs. Finnerty and Savitscus used terms that are vague and vocationally undefined, such as "superficial" interaction, and their social limitations have been adjusted to be more vocationally defined (Exhibits 3A, 4A, 7A, and 8A). Her ability to perform some work activity throughout the period under review, along with her testimony that she continues to be able to ride the bus and

> go shopping as needed, supports the limitations used in the residual functional capacity in lieu of the vague and vocationally undefined terms used in the opinions of Drs. Finnerty and Savitscus. Accordingly, the opinions of Drs. Finnerty and Savitscus are only somewhat persuasive.

(Tr. 28–29).

Plaintiff takes issue with how the ALJ characterized "superficial" interaction. (Doc. 9 at 7). But no regulation from the Social Security Administration requires an ALJ to analyze superficial interactions a specific way. The heart of the case law cited by Plaintiff on this issue emphasizes the need for the ALJ to address both the quality and quantity of social interactions in its RFC determination—not the need for the ALJ to include buzz words like "superficial interactions" in order to avoid remand. *See Corey v. Comm'r Soc. Sec.*, No. 2:18-cv-1219, 2019 WL 3226945, at *4 (S.D. Ohio July 17, 2019); *Lindsey v. Comm'r Soc. Sec.*, No. 2:18-CV-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018); *Hurley v. Berryhill*, No. 1:17-CV-421-TLS, 2018 WL 4214523, at *4 (N.D. Ind. Sept. 5, 2018). The ultimate question the Court must address in its evaluation of the ALJ's decision is whether she meaningfully considered the type of interactions Plaintiff can have in a work environment.

Here, the ALJ determined that Plaintiff's work interactions should not require direct supervision or teamwork and should be limited with coworkers and supervisors. (Tr. 28–29). The ALJ considered Dr. Finnerty and Dr. Savitscus's opinion but found their conclusion to contradict the other persuasive evidence that suggested that Plaintiff could have limited sorts of interactions with others. The ALJ highlighted that the doctors' opinion—that Plaintiff had goal-oriented thought processes; her associations were intact; she was insightful of her condition; and her recent memory, remote memory, attention span, and concentration were all average—were indicative of an ability to perform work. (*Id.*). The ALJ discussed Plaintiff's ability to perform some work activity throughout the review period, namely working as a custodian in buildings without

ventilation or air conditioning in July 2019. (*Id.*). The ALJ also noted that Plaintiff had not been terminated from a job in about five to ten years but had quit instead. (Tr. 23). The ALJ used this evidence in conjunction with other evidence pertaining to work interaction in limiting Plaintiff's RFC to no tandem tasks or teamwork. (Tr. 22).

The ALJ also discussed the Plaintiff's ability to interact with the general public. (*Id.*). The ALJ relied on Plaintiff's own admissions that Plaintiff rode the bus occasionally, went grocery shopping once a week, went to church once a month, and saw friends and family sometimes. (Tr. 28–29). Furthermore, the ALJ pointed out Plaintiff's self-assessment where Plaintiff said that she was able to interact with the general public. (Tr. 20). As noted above, an ALJ "is not required to defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from medical sources." 20 C.F.R. 416.920(c)(a). She correctly considered the doctors' opinion and made a determination in relation to their findings. That the determination differs from what the Doctors recommended is not enough to say that the ALJ did not adequately consider their opinion. *Julie P. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4170, 2022 WL 2352454, at *6–7 (S.D. Ohio June 30, 2022). Further, that the ALJ did not label any limitations to Plaintiff's interactions as quantitative or qualitative in the RFC does not mean she did not adequately explain her RFC determination or address both the quality and quantity of social interactions in that determination. The ALJ meaningfully considered what the appropriate limitations are to Plaintiff's interactions with the public, supervisors, and coworkers.

At bottom, the ALJ's decision does not reach the level of reversible error. She adequately considered the evidence provided and used it to support her conclusion. The reviewing court "will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Rabbers v.*

*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (citations omitted). Thus, the fact that the ALJ supported her decision with the evidence in the medical record supports a finding that there were no major procedural lapses calling for the reversal of her decision.

## IV. CONCLUSION

Based on the foregoing discussion, it is **ORDERED** that Plaintiff's Statement of Errors (Doc. 9) is **OVERRULED** and that judgment be entered in favor of Defendant.

IT IS SO ORDERED.

Date: January 9, 2023

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE